UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NORTH AMERICAN DERIVATIVES
EXCHANGE, INC., d/b/a OG,

                      Plaintiff,

      v.

NICHOLAS W. BROWN, in his official
capacity as Attorney General for the State of
Washington; TINA GRIFFIN, in her official
capacity as Executive Director of the
Washington State Gambling Commission;
SARAH LAWSON, in her official capacity as
Chair of the Washington State Gambling
Commission; ALICIA LEVY, in her official
capacity as Vice Chair of the Washington State
Gambling Commission; NOAH
SKARTVEDT, in his official capacity as
Commissioner of the Washington State
Gambling Commission; and MICHAEL
CHARLES, in his official capacity as
Commissioner of the Washington State
Gambling Commission,

                    Defendants.

No. 2:26-cv-02579

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 1
CASE NO. 2:26-CV-02579

Plaintiff North American Derivatives Exchange, Inc., d/b/a OG ("OG")[1], by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

**<u>INTRODUCTION</u>**

1.      OG seeks declaratory and injunctive relief to restrain the Attorney General of Washington ("Attorney General of Washington" or "State Attorney General") and the Members of the Washington State Gambling Commission (the "WSGC") (collectively, "Defendants") from improperly and under color of Washington state law assuming jurisdiction over, regulating and terminating OG's listing of lawful derivatives contracts on its federally regulated market.

2.      OG is a designated contract market ("DCM") regulated by the U.S. Commodity Futures Trading Commission ("CFTC") that lists event contracts for trading in interstate commerce.  OG offers event contracts to Washington residents in the state of Washington under the authority granted to it by the CFTC.  The State Attorney General has purported to assert jurisdiction over KalshiEx ("Kalshi"), another federally regulated DCM, by filing suit to enjoin its offering of event contracts.  *State v. KalshiEx LLC*, No. 26-2-10264-3 (King Cnty. Super. Ct. Mar. 27, 2026) (the "Kalshi Action").  Consistent with the Kalshi Action and Defendants' public statements evincing an intent to attempt to enforce Washington gambling laws against federally regulated exchanges, Defendants will take the same action against OG.

3.      The crux of Defendants' assertion of authority is their conclusion that, notwithstanding federal regulation, contracts traded on DCM exchanges are "Illegal Gambling Activities" subject to Washington gaming laws.  Complaint*, State v. KalshiEx LLC*, No. 26-2-10264-3 (King Cnty. Super. Ct. Mar. 27, 2026) (the "Kalshi Complaint").  But Defendants ignore that Congress expressly conferred "exclusive jurisdiction" over DCMs and the products

---

[1]   North American Derivatives Exchange, Inc. launched OG in February of 2026 to provide a separate technology platform for users to access listed event contracts, distinct from the company's other offerings. *See* N. Am. Derivatives Exch., *OG.com or OG is a New Brand Association with the Exchange's Prediction Market Offering of Derivatives* (Feb. 4, 2026), https://www.nadex.com/notices/og-com-or-og-is-a-new-brand-associated-with-the-exchanges-prediction-market; Crypto.com, *Crypto.com Launches "OG"—a New Prediction Market Experience* (Feb. 3, 2026), https://crypto.com/us/company-news/cryptocom-launches-og-a-new-prediction-market-experience.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 2
CASE NO. 2:26-CV-02579

they make available for trading to the CFTC to ensure a uniform national derivatives market. 7 U.S.C. § 2(a)(1)(A). Amendments to the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* ("CEA") have reinforced that policy decision over many years, with Congress affirmatively excluding state authorities like the WSGC from playing any role in overseeing contracts traded on federally regulated derivatives exchanges. *See infra* ¶¶ 28-41. And federal courts have long recognized that the CFTC's regulation of the national derivatives market is exclusive and preempts state involvement.[2] The CFTC has also confirmed its position that state enforcement against CFTC-designated contract markets violates the Supremacy Clause. *See infra* ¶¶ 37-40.

4. OG brings this action to obtain declaratory and injunctive relief to protect its right to offer event contracts pursuant to federal law and regulation.

5. Over the years, many states have sought to regulate trading of such products under their state gaming laws based on their policy judgment that speculation on future events was, in effect, gambling. Congress, however, has always assumed control over the regulation of the derivatives markets at the federal level. And it consistently expanded the scope of the products covered by federal regulation, including to cover swaps and what are known as contracts on "excluded commodities."

---

[2] *See, e.g.*, *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1055-57 (9th Cir. 2003) (finding the CEA preempted California's Bucket Shop Law as applied to swaps exempted from coverage by the CEA); *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 560, 563-64 (6th Cir. 1998) (noting that "[f]utures trading is conducted on exchanges designated as contract markets by the [CFTC], an independent agency created by Congress in 1974 to exercise *exclusive jurisdiction* over accounts, agreements, and transactions involving commodities futures contracts traded or executed on a contract market" and holding that a CEA regulation conflict preempted an Ohio statute that required payment to investors of any interest earned on collateral because it stood "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, as manifested in the language, structure and underlying goals of the CEA" (emphasis added)); *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1155-57 (7th Cir. 1992) (holding the CEA preempted state law whose application "would directly affect trading on or the operation of a futures market"); *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (holding CEA "preempts the application of state law" to futures trading); *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (per curiam) (affirming dismissal of a claim that trading in futures contracts violated Georgia gambling statute "on the ground that the Commodity Exchange Act preempts all state laws inconsistent with its provisions").

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 3
CASE NO. 2:26-CV-02579

BALLARD SPAHR LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WA 98101
206.223.7000  FAX: 206.223.7107

6. Congress could not have been more clear that its purpose was to create a single, national derivatives market subject to regulation at the federal level. The CEA itself recites Congressional findings that:

> The transactions subject to this chapter are entered into regularly in interstate and international commerce and are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities.

7 U.S.C. § 5(a). It also cites Congress's intention for creating a regulated national market:

> It is the purpose of this chapter to serve the public interests described [above] through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission.

*Id*. § 5(b).

7. OG has operated as a federally regulated DCM since 2004.[3] All of its products are certified pursuant to the CEA and established CFTC rules and are offered in compliance with CFTC regulations, including standards for contract specifications, market integrity, and trader protections. As a CFTC-registered self-regulatory organization, OG also administers a comprehensive market regulation program, functioning in a regulatory capacity to oversee trading in its markets. This program is subject to CFTC oversight and has been reviewed and approved by the CFTC.

8. Among OG's offerings are "event contracts" defined by the CEA and the CFTC as derivatives or swaps whose returns depend on the occurrence, non-occurrence, or extent of an occurrence of a specified event or contingency.[4] At issue here are OG's event contracts,

---

[3] The CFTC's orders approving North American Derivative Exchange, Inc.'s designation as a DCM are publicly available on the CFTC's Industry Filings page. *See Industry Filings, N. Am. Derivatives Exchange, Inc.*, CFTC, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizations/34536.

[4] *See* Commodity Exchange Act, 7 U.S.C. § 1a(47); *Industry Oversight: Contracts & Products*, CFTC, https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm. Examples of "event contracts" listed on the CFTC website include predicted corporate earnings, level of snowfall, and dollar value of damage caused by a hurricane. *Id.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 4
CASE NO. 2:26-CV-02579

including its "Sports Event Contracts," with return profiles dependent on the occurrence of specified events associated with a sports event, for example, a certain team or participant winning or losing.

9. When it granted the CFTC exclusive jurisdiction over DCMs and the contracts traded on them, Congress authorized the agency to review certain event contracts and prohibit them if it determines that their trading would be contrary to "the public interest." 7 U.S.C. § 7a-2(c)(5)(C). The CFTC has adopted a 90-day review process for assessing whether an event contract should be suspended as contrary to public interest. *See* 17 C.F.R. § 40.11. None of the contracts listed on OG's market are currently under such review by the CFTC, and none of the Sports Event Contracts offered for trading on OG have been prohibited.

10. Congress has expressly preempted state regulation of trading on DCMs by granting the CFTC "exclusive jurisdiction" to regulate trading on DCMs, including of options and "transactions involving swaps." 7 U.S.C. § 2(a)(1)(A). A savings clause allows states to regulate conduct that does *not* fall within the CFTC's exclusive jurisdiction, confirming that the CFTC's exclusive jurisdiction is indeed exclusive. *See id.*

11. Congress has fully occupied the field of regulating federally registered DCMs, thereby preempting any overlapping state laws. Because OG's event contracts are lawfully traded on a CFTC-registered DCM, federal law overrides state licensing or registration conditions that might otherwise apply, including those cited by the State Attorney General in the Kalshi Complaint. *See* Kalshi Complaint ¶¶ 5.2-6.12 (alleging that Kalshi's event contract activities violate RCW §§ 9.46.0241(3)–(4), 9.46.0253, 9.46.0269(d), 9.46.0368, 9.46.180, 9.46.215, 9.46.217, 9.46.220-.222, 9.46.228, 9.46.240, 19.86.010, 19.86.020). To the extent that Washington law imposes regulations that overlap with the CEA's framework, those laws are preempted under Article VI, Section 2 of the United States Constitution ("Supremacy Clause").

12. Insofar as it would prohibit OG from listing contracts that are authorized under federal law, Washington law is also preempted because it conflicts with the CEA's framework.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 5
CASE NO. 2:26-CV-02579

OG cannot comply with both its federal law obligations and any purported obligations under Washington law.  Washington law also undermines the CEA's goals of, among other things, creating a uniform system of derivatives trading.

13.    The threat of Defendants' enforcement of Washington law poses a direct and imminent threat to OG's business and its users and disrupts the comprehensive federal framework that places OG exclusively under the CFTC's supervision.

14.    A declaratory judgment and injunction are necessary to prevent Defendants' unlawful intrusion into a market which they have no legal authority to regulate.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims in this case arise under the Constitution and the laws of the United States—specifically, whether Washington law is preempted by the CEA as applied to OG's event contracts.  The Court also has jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, to declare the rights and legal relations of the parties.

16.    This Court has personal jurisdiction over the Defendants.  The Defendants are domiciled in Washington and perform their official duties in Washington.

17.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and 1391(b)(2). The Defendants perform their duties and thus reside in this District.  A substantial part of the events giving rise to the claims occurred in this District.

## PARTIES

18.    Plaintiff North American Derivatives Exchange, Inc., doing business as OG, is a financial services company with its principal place of business in Chicago, Illinois.  OG operates a DCM and Derivatives Clearing Organization ("DCO") regulated by the CFTC under the CEA, where users can trade financial products, including event contracts.

19.    Defendant Nicholas W. Brown is the Attorney General for the State of Washington and is sued in his official capacity.  The Attorney General of Washington is the state's chief legal officer.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 6
CASE NO. 2:26-CV-02579

20.    Defendant Tina Griffin is sued in her official capacity as Executive Director of the WSGC.

21.    Defendant Sarah Lawson is sued in her official capacity as Chair of the WSGC.

22.    Defendant Alicia Levy is sued in her official capacity as Vice Chair of the WSGC.

23.    Defendant Noah Skartvedt is sued in his official capacity as Commissioner of the WSGC.

24.    Defendant Michael Charles is sued in his official capacity as Commissioner of the WSGC.

25.    Together, Defendants Tina Griffin, Sarah Lawson, Alicia Levy, Noah Skartvedt, Michael Charles, and State Attorney General Nicholas W. Brown would be responsible for enforcing Washington state laws that are preempted by federal law.

## FACTUAL ALLEGATIONS

26.    Defendants have sought to enforce state gambling laws against Kalshi, another federally regulated exchange subject to the CFTC's exclusive jurisdiction.  This action is consistent with Defendants' public statements evincing an intent to enforce, WSGC's formal guidance declaring prediction markets "unauthorized" in Washington, and Washington's multijurisdictional advocacy in support of state regulators in event contract litigation, including as *amicus curiae* in a Ninth Circuit appeal in which OG is an opposing party. *See infra* ¶¶ 74-82.  Thus, there is a concrete and imminent threat that Defendants will take the same actions against OG as they did against Kalshi.  Because the CFTC has exclusive jurisdiction over federally registered markets and intermediaries, Defendants' efforts to prohibit the trading of event contracts listed on federally regulated markets are preempted by federal law.  OG is entitled to a judicial declaration that its activities are not subject to Defendants' oversight, regulation, or jurisdiction, as well as an injunction barring Defendants from any future enforcement efforts.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 7
CASE NO. 2:26-CV-02579

**A.**     **The CFTC Has Exclusive Jurisdiction to Regulate Derivatives Contracts on Federally Registered Markets.**

27.     Derivatives are financial instruments used to allocate risk between counterparties.  The archetypal example is a grain futures contract, which allows buyers to lock in prices and manage volatility in agricultural markets by agreeing to buy or sell a specified amount of the crop at a fixed price on a future date.

28.     As financial markets have matured, the category of derivatives has expanded significantly beyond futures based on agricultural commodities, enabling participants to hedge against volatility across a wide array of tangible and intangible areas, including commodities like gold, financial benchmarks such as interest rates, and even weather or credit risk.  In principle, nearly any form of risk—economic, environmental, or event-driven—can be hedged if a CFTC-regulated market exists and a contract is available.

29.     For more than a century, the federal government has regulated national derivatives markets in order to promote uniformity and integrity in national trading.

30.     Before the adoption of the CEA and its predecessor, the 1922 Grain Futures Act, futures contracts were often viewed with suspicion by state legislatures.  Because derivatives markets necessarily involve the exchange of money tied to uncertain outcomes, some states equated them to gambling and sought to restrict or prohibit their use.  This led to a disjointed and often conflicting state-by-state approach.

31.     The CEA, enacted in 1936, was intended to replace the fragmented system of state oversight with a uniform federal framework for regulating futures markets.  It extended federal authority beyond grain to a broader class of commodities and created the Commodities Exchange Authority, a division within the Department of Agriculture charged with monitoring trading practices and prosecuting price manipulation.  But the CEA did not initially establish an independent federal agency to comprehensively regulate the nation's derivatives markets.  As markets grew more complex, lawmakers and industry participants became concerned that

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 8
CASE NO. 2:26-CV-02579

the lack of centralized enforcement would invite states to regulate futures trading on their own, leading to inconsistent standards across jurisdictions.

32.    In response, Congress enacted sweeping amendments to the CEA in 1974 (the "1974 Act"), which established the CFTC as an independent federal agency charged with regulating the national derivatives markets.    To eliminate the threat of conflicting state regulation, Congress expressly granted the CFTC "exclusive jurisdiction" over derivatives trading on federally regulated exchanges.    7 U.S.C. § 2(a)(1)(A).

33.    Proponents of the 1974 Act warned that, absent a single national regulator, "states . . . might step in to regulate the futures markets themselves," subjecting national exchanges to "conflicting regulatory demands." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992).    As one Senator put it, "different State laws would just lead to total chaos." *Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry*, 93rd Cong., 2d Sess. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen. Clark).    The House Agriculture Committee stressed the need to bring "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned."    H.R. Rep. No. 93-975, at 79 (1974).    To that end, the Senate deliberately removed a provision of the CEA that would have preserved state regulatory authority "in order to assure that [f]ederal preemption is complete."    120 Cong. Rec. 30,464 (1974) (statements of Sen. Curtis, supported by Sen. Talmadge).

34.    Congress's intent to vest the CFTC with exclusive authority over derivatives markets is further demonstrated by subsequent amendments to the CEA, including the 1992 Futures Trading Practices Act ("FTPA").    That law authorized the CFTC, in order to promote innovation, to exempt certain financial instruments from the requirement that they be traded on a registered exchange.    *See* 7 U.S.C. § 6(c).    Because the preemption provision in 7 U.S.C. § 2 applies only to derivatives traded on CFTC-registered markets, Congress included a separate provision in the FTPA explicitly preempting "any State or local law that prohibits or regulates gaming" with respect to any agreement, contract, or transaction exempted from the exchange-

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 9
CASE NO. 2:26-CV-02579

BALLARD SPAHR LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WA 98101
206.223.7000  FAX: 206.223.7107

trading requirement.  7 U.S.C. § 16(e)(2).  That provision extended the scope of federal preemption to off-exchange transactions under the CFTC's oversight, reinforcing Congress's intent to create a comprehensive and uniform federal framework for derivatives regulation.

35.    The creation of the CFTC and the centralization of derivatives market regulation within a single independent federal agency reflect a clear exercise of Congress's authority to regulate interstate commerce and establish consistent national rules.  As mandated by the CEA, which was significantly amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), the CFTC has adopted regulations setting out "Core Principles" that DCMs must follow.  For example, one Core Principle requires DCMs to offer impartial access to their markets and services to users across the country.  *See* 17 C.F.R. § 38.151(b).  Compliance with a patchwork of differing state regulations would undermine this obligation and make it impossible for DCMs like OG to comply with the CFTC's impartial access rule.

36.    Congress's decision to create a national market for derivatives products reflected a federal policy choice to permit their trading even if individual states might have preferred to prohibit them.  Since their inception, derivatives contracts have been the subject of ongoing debate over whether they should be treated as a form of gambling, with some arguing that they should only be permitted where a party to a contract has actual exposure to an underlying commercial risk they are attempting to hedge.

37.    But Congress and the CFTC have entirely rejected this approach.  Instead, the federal policy has been to recognize the legitimacy of speculative trading and its role in supporting market liquidity.  As one scholar observed, this reflects a federal commitment to "acknowledge the legitimacy of futures contracts" and "the need for speculative capital to provide liquidity to the markets."  William L. Stein, *The Exchange-Trading Requirement of the Commodity Exchange Act*, 41 Vand. L. Rev. 473, 477 (1988).

38.    The CFTC has confirmed this approach by bringing actions against the states and state regulators in eight states, alleging that federal law preempts state law regulating event

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 10
CASE NO. 2:26-CV-02579

contracts traded on federally regulated markets. *See United States & CFTC v. Arizona*, No. 2:26-cv-2246 (D. Ariz. Apr. 2, 2026); *United States & CFTC v. Connecticut*, No. 3:26-cv-498 (D. Conn. Apr. 2, 2026); *United States & CFTC v. Illinois*, No. 1:26-cv-3659 (N.D. Ill. Apr. 2, 2026); *United States & CFTC v. New York*, No. 1:26-cv-3404 (S.D.N.Y. Apr. 24, 2026); *United States & CFTC v. Wisconsin*, No. 2:26-cv-749 (E.D. Wis. Apr. 28, 2026); *United States & CFTC v. Minnesota*, No. 0:26-cv-02661 (D. Minn. May 19, 2026); *United States & CFTC v. New Mexico*, No. 1:26-cv-01912 (D.N.M. June 12, 2026); *United States & CFTC v. Kentucky*, No. 3:26-cv-00049 (E.D. Ky. June 23, 2026). The CFTC also moved to intervene in a lawsuit brought by Kalshi against state regulators in Rhode Island. *KalshiEX LLC v. Furcolo*, No. 1:26-cv-00327 (D.R.I. May 28, 2026) ECF No. 19. The CFTC has also submitted briefs as an amicus curiae supporting OG's action brought against state regulators in Nevada and supporting Kalshi's actions brought against state regulators in Ohio and Tennessee. Brief for CFTC as Amicus Curiae Supporting Plaintiff, *N. Am. Derivatives Exch. Inc. v. Nevada.*, No. 25-7187 (9th Cir. Feb. 17, 2026) ECF No. 38; Brief for CFTC as Amicus Curiae Supporting Plaintiff, *KalshiEX, LLC. v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026) ECF No. 31; Brief for CFTC as Amicus Curiae Supporting Plaintiff, *KalshiEX, LLC. v. Orgel*, No. 26-5235 (6th Cir. June 24, 2026) ECF No. 63.

39. The CFTC has issued several Notices of Proposed Rulemaking Relating to Prediction Markets. The CFTC issued Release No. 9194-26 (Mar. 12, 2026) along with a Prediction Markets Advisory (CFTC Letter No. 26-08) explaining that event contracts are "swaps" under the CEA. The CFTC also issued Release No. 9249-26 (June 10, 2026) seeking public comment on a proposed amendment to Regulation 40.11 (17 C.F.R. § 40.11) that would define contracts related to "gaming" and provide further clarity regarding the CFTC's statutory authority to review specific contracts and determine whether they are contrary to the public interest. *See infra* ¶¶ 61-65.

40. Indeed, the CFTC recently reaffirmed its position that a patchwork of differing state regulations would make it impossible for DCMs like OG to comply with CEA Core

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 11
CASE NO. 2:26-CV-02579

BALLARD SPAHR LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WA 98101
206.223.7000  FAX: 206.223.7107

Principles. On July 12, 2026, in response to a state court decision ordering Kalshi to "void[], cancel[], and refund[]" trades entered into by Kalshi traders located in Michigan, Kalshi notified the CFTC that it would "force-liquidate the open positions of specific users identified and directed by the Court."[5] In response, on July 14, 2026, the CFTC issued an Order directing Kalshi to "fulfill the open trades in question as it would in the ordinary course of business." *Id*. at 9. The CFTC found that the "unprecedented order requiring Kalshi to unwind open, previously executed trades" constitutes a "'major market disturbance which prevents the market from accurately reflecting the forces of supply and demand' with respect to event contracts." *Id*. at 6-7. Most significantly, the CFTC wrote that "forced liquidation of trades will cause distortions" which "would, among other things, violate CEA Core Principle 4, which requires DCMs to prevent manipulation, price distortion, and disruption of the cash-settlement process." *Id*. at 8. This directive applies with equal force here and nationwide.

41. Congress's longstanding policy of permitting broad market participation is integral to the healthy functioning of these markets. Restricting financial derivatives to participants with a direct risk in the outcome would diminish liquidity, impair price discovery, and undermine the market's essential role in allocating and managing risk. *See* William L. Stein, *The Exchange-Trading Requirement of the Commodity Exchange Act*, 41 Vand. L. Rev. 473, 482-85 (1988) (describing the policy rationale behind restricting futures trading to designated exchanges).

**B.    Event Contracts Are Exchange-Traded Financial Instruments Used for Allocating Risk.**

42. Event contracts are exchange-traded financial instruments, known as derivatives or swaps, which facilitate risk allocation to specified occurrences, non-occurrences, or the

---

[5] CFTC Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents, *In re Matter of KalshiEX LLC's Notice Regarding Market Emergency Declaration and Emergency Rule Filing Pursuant to Commission Regulation 40.6(a)*, CFTC (July 14, 2026), https://www.cftc.gov/filings/documents/2026/orgcftcorderstayingkalem61407.pdf (hereinafter "CFTC Order").

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 12
CASE NO. 2:26-CV-02579

BALLARD SPAHR LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WA 98101
206.223.7000  FAX: 206.223.7107

extent of occurrences of underlying future events or contingencies. *See* 7 U.S.C. § 1a(47) (defining "swap").

43.    Event contracts typically reference the occurrence or non-occurrence of an event or contingency, represented by "yes" or "no" positions. A trader who takes an event contract with the "yes" position profits if the specified event or contingency occurs by the expiration date, while the "no" position purchaser profits if it does not. An active position may also be closed at a profit or loss prior to the occurrence or non-occurrence of the specified event or contingency.

44.    An event contract might be tied to specified movements of a financial index or a real-world event. For example, an event contract could be tied to changes in the yield on the 10-year U.S. Treasury note, the magnitude of the upcoming hurricane season, or to the events or contingencies associated with political, scientific or live sporting events. But, outside of its authority to prohibit specifically enumerated event contracts that it subsequently determines are contrary to the public interest, the CFTC does not purport to define what events are or are not properly the subject of event contracts. Rather, the regulatory approach that Congress has directed and that the CFTC has pursued is to allow the market to define the nature of the events on which parties wish to contract.

45.    The price of an event contract is determined by market forces, namely the supply and demand for entering into the "yes" and "no" positions of the contract. An event contract has a set expiration date, and the price of an event contract will fluctuate along with the market's perception of the likelihood of an event's occurrence until settling at a final price on the expiration date.

46.    The operator of a DCM on which event contracts are traded facilitates their trading by matching counterparties to each other. Unlike casinos, a DCM that lists an event contract does not act as a "bookmaker." It does not take opposing positions or set odds. Instead, it facilitates a neutral, transparent marketplace where prices are established openly among participants based on supply and demand.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 13
CASE NO. 2:26-CV-02579

47.    Event contracts allow market participants, including those with a financial stake in the occurrence or non-occurrence of a particular event or contingency, to hedge against related risks.  These contracts have become a valuable risk management tool because they are linked to real-world events with commercial consequences and offer public utility by reflecting the market's aggregated expectations about whether those events will occur.  Event contracts where the underlying event relates to a sporting event may be used to hedge this type of risk across a variety of commercial scenarios, including:

a.    Media and broadcasting companies that face financial exposure tied to viewership, which can fluctuate significantly depending on how competitive or compelling a game is;

b.    Retailers that sell team merchandise or apparel who see major swings in sales depending on whether a popular team advances or whether a player affiliated with their brand wins a championship;

c.    Travel and hospitality businesses that experience spikes in bookings if a local team advances or hosts a high-profile event, creating exposure to outcomes they cannot control;

d.    Restaurants and bars located around arenas such as Madison Square Garden, for example, can hedge against the risk of unexpected interruption to their business from major events[6] or whether additional games in the NBA finals will be played in the arena;

e.    Consumer goods companies, especially in the food and beverage industry, that run promotions tied to game results.  These campaigns, while effective for marketing, can carry substantial liabilities if the promotional conditions are met.  Advertisers and retailers offering giveaways or rebates based on a team's success face similar exposure; and

---

[6]    *See, e.g.*, Devin Gannon, *NYPD Closes Area Around MSG for Knicks Game*, 6sqft N.Y.C. (June 10, 2026), https://www.6sqft.com/nypd-closes-area-around-msg-for-knicks-game; Charlie McKenna, *Boston PD to Shut Down Area Around TD Garden During Celtics NBA Finals Game*, Mass Live (June 17, 2024), https://www.masslive.com/news/2024/06/boston-pd-to-shut-down-area-around-td-garden-during-celtics-nba-finals-game.html.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 14
CASE NO. 2:26-CV-02579

BALLARD SPAHR LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WA 98101
206.223.7000  FAX: 206.223.7107

f.      Fantasy sports platforms and sports data providers that rely on fan engagement and player performance, where a dull game or early elimination of a key player can significantly reduce user participation and revenue.

48.    These are just a few examples, but they underscore a broader point: Many businesses across diverse industries have meaningful financial exposure to the occurrence, non-occurrence, or extent of occurrence of events or contingencies connected to sporting events and may seek to manage that risk through event contracts.

**C.    The CEA and CFTC Regulations Establish a Comprehensive Federal Regulatory Framework for Trading in Event Contracts and Other Derivatives.**

49.    The federal regulatory framework governing DCMs and the trading of derivatives contracts on them is longstanding, comprehensive, and well-established.

50.    To offer derivatives for public trading, an entity must obtain designation from the CFTC as a contract market.  *See* 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a).

51.    To receive this designation, an applicant must submit detailed materials demonstrating compliance with the CEA's Core Principles.  *See* 17 C.F.R. § 38.3(a)(2); 7 U.S.C. § 7(d).  This requires it to show it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation.  *See* 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300.

52.    If approved by the CFTC and granted designation as a contract market, a DCM becomes subject to an extensive federal regulatory framework administered by the CFTC. DCMs are required to meet a wide range of ongoing regulatory obligations to remain in good standing, including: prescriptive capital and liquidity requirements, participant eligibility requirements, reporting obligations, recordkeeping requirements, and numerous operational

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 15
CASE NO. 2:26-CV-02579

and governance standards directed toward compliance with the CEA and its Core Principles. *See* 17 C.F.R. §§ 38.1101, 38.604, 38.1051(i), 38.950, 1.31; 38.450, 38.451; 7 U.S.C. § 7(d); *see generally* 17 C.F.R. pt. 38.

53.    Moreover, because of the breadth and depth of the regulatory framework applicable to a DCM, a market that has earned the CFTC's designation is granted the status of a self-regulatory organization under federal law.  As such, DCMs are entrusted with front-line responsibilities for establishing rules and enforcing their compliance, detecting and preventing market abuses, and ensuring the integrity of their listed products and intermediaries.  *See* 17 C.F.R. § 1.3, pt. 38.

54.    As a registered DCM and self-regulatory organization, OG is permitted to list derivatives for trading without obtaining the CFTC's prior approval for each individual contract.  However, it must adhere to product-related regulatory standards and certify that each new contract complies with applicable law by filing a written certification with the CFTC prior to the time of listing.  *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a).

55.    Written certifications are subject to CFTC regulation, and the CFTC may initiate a formal review of any submitted contract under its authority.  *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. §§ 40.2, 40.11(c).  After a stipulated period of time, if the CFTC does not take action, the contract is deemed "effective" and may be listed on the DCM for trading.  *See* 7 U.S.C. § 7a-2(c); *see also* 17 C.F.R. § 40.2 (outlining the process for listing products for trading by certification).

56.    OG's event contracts have all been certified and deemed "effective."  *See infra* ¶¶ 67-73.

**D.    The CFTC's Enforcement Authority Over DCMs and Its Power to Prohibit Contracts Contrary to the Public Interest.**

57.    In addition to regulatory oversight authority, the CFTC possesses exclusive and comprehensive enforcement powers with respect to DCMs, their intermediaries, and market participants.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 16
CASE NO. 2:26-CV-02579

58.     The CFTC's Division of Enforcement may initiate investigations and, with the approval of a majority of the Commission, bring enforcement actions in federal court or through administrative proceedings. *See* CFTC Division of Enforcement, Enforcement Manual (2020) at § 3.3. If the Division concludes that a violation of the CEA has occurred, it may recommend the Commission pursue a broad range of remedies, including civil monetary penalties, restitution, and disgorgement, as well as the suspension, denial, revocation, or restriction of registration and trading privileges. *Id.* The Commission may also pursue injunctive relief, including cease-and-desist orders, and can refer criminal violations to the Department of Justice for prosecution. *Id.*

59.     The scope of the CFTC's authority extends not only to market participants, but also to the types of derivatives products traded on DCMs. The Commission regulates a broad range of derivatives, including those based on physical commodities like wheat, cotton, rice, corn, and oats, as well as "excluded commodities" that are not tangible such as interest rates, financial instruments, economic indices, risk metrics, and events. 7 U.S.C. § 1a(9), (19)(i)–(iv).

60.     The CFTC regulates event contracts, including OG's event contracts, as a subcategory of derivatives that reference an "excluded commodity." *See id.* § 1a(47)(A)(ii), (iv), (vi). "Event contracts" are defined broadly under the CEA as relating to any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences. 7 U.S.C. § 7a-2(c)(5)(C)(i); § 1a(19)(iv).[7]

61.     In 2010, the Dodd-Frank Act amendments to the CEA also specifically addressed event contracts. The amended statute created a "Special Rule" for event contracts that granted the CFTC discretionary authority to determine whether specific event contracts are "contrary to the public interest" and prohibit them from trading on DCMs.

---

[7] Events themselves are an excluded commodity under the CEA. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 17
CASE NO. 2:26-CV-02579

BALLARD SPAHR LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WA 98101
206.223.7000  FAX: 206.223.7107

62.    This discretionary authority applies where, in the CFTC's determination, a contract references an underlying activity that falls into one of several specifically enumerated categories listed in the CEA that may warrant further review as to whether allowing them to trade would be in the public interest.  These categories include contracts that reference terrorism, assassination, war, gaming, activity that is unlawful under federal or state law, or other similar activity, and is contrary to the public interest.  *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).

63.    This Special Rule does not require the CFTC to disallow event contracts referencing these underlying activities, but grants the agency the discretion to conduct a public interest review based on its own criteria.

64.    The CFTC's authority is focused not on the terms of the event contract itself, but on the nature of the underlying event.  While federal law generally authorizes the trading of event contracts, the CFTC may prohibit contracts from being listed or traded on DCMs where the referenced activity (i.e., the "excluded commodity") "involves, or relates to" specifically enumerated conduct that the CFTC determines to be contrary to the public interest.  17 C.F.R. § 40.11.

65.    This framework reflects a deliberate policy choice: Congress did not authorize or delegate to states the power to override or nullify federal authorization of event contracts by deeming them unlawful under state law.  Rather, Congress granted the CFTC exclusive authority to establish the criteria and process for assessing whether a referenced activity should be disallowed from underlying an event contract trading on national derivatives markets as contrary to the public interest.  Pursuant to this authority, the CFTC has promulgated regulations that establish procedures by which the CFTC may determine whether trading in a specific contract should be suspended.  *See* 17 C.F.R. § 40.11.  This includes placing the contract in a 90-day review period, at the conclusion of which the CFTC may determine a contract is contrary to the public interest and order the DCM to suspend its trading.  *See* 17 C.F.R. § 40.11(c).  The CFTC recently proposed to amend this process by imposing three conditions that must occur before a contract may be deemed contrary to the public interest.  (CFTC Release No. 9249-26).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 18
CASE NO. 2:26-CV-02579

First, the agreements, contracts, transactions, or swaps must be "based upon the occurrence, extent of an occurrence, or contingency." *Id.* Second, the agreements, contracts, transactions, or swaps must "involve" any of the enumerated activities (gaming, war, terrorism, assassination, and activities illegal under state and federal law). *Id.* Third, the CFTC must affirmatively determine that the agreements, contracts, transactions, or swaps are contrary to the public interest. *Id.*

66. OG's event contracts have not been subjected to a 90-day review, have not been determined to be contrary to the public interest, and have not been ordered to be suspended from trading by the CFTC.

**E.      OG Is a Federally Regulated DCM That Lists Event Contracts.**

67. OG is a federally regulated DCM that provides a market for trading a variety of derivatives products, including event contracts, some of which are based on the occurrence, non-occurrence, or extent of occurrence of events or contingencies associated with live sporting events.

68. The CFTC first approved OG as a DCM in 2004, confirming that its market complied with the CEA. Most recently in September 2025, the CFTC amended its registration, again confirming OG's compliance with the CEA. For two decades, the entity now known as OG has operated continuously as a CFTC-regulated market offering event contracts.

69. As an early entrant in the regulated event contract space, OG specializes in event contract trading and has steadily expanded its offerings over time. Its market provides a secure, federally approved exchange where individual, retail, and institutional participants can hedge risk tied to event-based outcomes.

70. On January 30, 2025, pursuant to 7 U.S.C. § 7a-2(c)(1) and 17 C.F.R. §§ 40.2(a), OG certified and announced its intention to list a new category of event contracts: "Industry Event - Live Presentations" contracts.[8] These contracts allow users to trade on the occurrence,

---

[8]    North American Derivative Exchange, Inc.'s January 30, 2025 certification pertaining to the Sports Event Contracts is publicly available on the CFTC's website. *Industry Filings, Certification of Contingent Derivatives Contract (Industry Event–Live Presentations–NAICS 711)–Submission Pursuant to Commission*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 19
CASE NO. 2:26-CV-02579

non-occurrence, or extent of occurrence of events or contingencies relating to lawful live events in the performing arts, spectator sports, and related industries, provided the users themselves are not participants in the events. *Id.* at 4-5.

71.    OG designed these event contracts "to manage the risk of a variety of market participants, whose businesses face economic consequences based on the outcome of a respective Industry Event, and to enable price discovery for related commercial enterprises." *Id.* at 8. Examples include contracts tied to the winner of an award like "Best Picture," the location of a flagship event or ceremony, or the winner of a live sporting event like the Super Bowl.

72.    OG's currently listed "Industry Event - Live Presentations" contracts, became effective under the process described *supra* ¶¶ 54-56. This includes Sports Event Contracts, which are the subset of OG's "Industry Event - Live Presentations" contracts that reference the occurrence, non-occurrence, or extent of occurrence of events or contingencies associated with live sporting events.

73.    OG subsequently certified additional event contracts that reference the occurrence, non-occurrence, or extent of occurrence of events or contingencies associated with live sporting events, including its certification of "Contingent Derivatives Deci Contract (Industry Event–Live Presentations–NAICS 711)," filed on July 30, 2025,[9] and "Derivatives Contract (Industry Event–Live Presentations–Statistics)," filed on August 29, 2025.[10] As with

*Regulation 40.2(a)*, CFTC (Jan. 30, 2025), https://www.cftc.gov/sites/default/files/filings/ptc/25/01/ptc01302514705.pdf (hereinafter, "January 30, 2025 Certification Filing").

[9]  North American Derivative Exchange, Inc.'s July 30, 2025 certification pertaining to the Sports Event Contracts is publicly available on the CFTC's website. *Industry Filings, Certification of Contingent Derivatives Deci Contract (Industry Event–Live Presentations–NAICS 711)–Submission Pursuant to Commission Regulation 40.2(a)*, CFTC (July 30, 2025), https://www.cftc.gov/sites/default/files/filings/ptc/25/07/ptc07302527650.pdf.

[10]  North American Derivative Exchange, Inc.'s August 29, 2025 certification pertaining to the Sports Event Contracts is publicly available on the CFTC's website. *Industry Filings, Certification of Derivatives Contract (Industry Event–Live Presentations –Statistics)–Submission Pursuant to Commission Regulation 40.2(a)*, CFTC (Aug. 29, 2025), https://www.cftc.gov/sites/default/files/filings/ptc/25/08/ptc08292529772.pdf.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 20
CASE NO. 2:26-CV-02579

the Sports Event Contracts certified under OG's January 30, 2025 Certification Filing, OG identified in these certifications the financial, commercial, and economic consequences associated with the underlying events.

**F.     Defendants Filed an Action to Enforce State Civil Penalties Against a CFTC Designated Market Offering Event Contracts in Washington.**

74.     On December 9, 2025, the WSGC issued guidance on prediction markets which warned that "prediction markets are an unauthorized activity in Washington State" and that "[o]ffering events-based contracts or participating in these markets is not authorized in Washington State." Press Release, Wash. State Gambling Comm'n, Prediction Markets (Dec. 9, 2025), https://wsgc.wa.gov/news/2025/prediction-markets

75.     On March 27, 2026, Defendant Brown, in his official capacity as the State Attorney General, filed a civil enforcement action in King County Superior Court against Kalshi asserting that federally regulated event contracts violate Washington's prohibitions against betting and wagering pursuant to RCW §§ 19.86.080, 19.86.140, 43.10.030, 9.46.010, 4.24.070, among others. *See generally* Kalshi Complaint. The State Attorney General alleges that Kalshi operates an illegal online betting platform in violation of Washington's Gambling Act, Consumer Protection Act, and Recovery of Money Lost at Gambling Act, that all of Kalshi's federally regulated event contracts violate Washington's Consumer Protection Act, Gambling Act, and Recovery of Money Lost at Gambling Act, and that Kalshi is "offering, operating, conducting, marketing, promoting, and/or distributing unlicensed and Illegal Gambling Activities to Washington consumers." *Id*. ¶¶ 2.1, 3.4. The State Attorney General further alleges that "[u]nder longstanding, well-established, and unambiguous Washington state law, Kalshi's gambling operation is illegal," and that "every core feature of Kalshi's Illegal Gambling Activities—its wagers, fees, and online transmission of gambling information—constitutes illegal online gambling." *Id*. ¶¶ 1.1, 4.18. The State Attorney General seeks injunctive relief, restitution, disgorgement, civil penalties, an accounting, and other remedies. *Id*. ¶¶ 7.1–7.12. At bottom, the State Attorney General alleges that *all* event contracts,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 21
CASE NO. 2:26-CV-02579

BALLARD SPAHR LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WA 98101
206.223.7000  FAX: 206.223.7107

regardless of subject matter, are unlawful under Washington law, *id.* ¶¶ 4.3–4.4, 4.9–4.10, notwithstanding federal law authorizing such contracts and affording the CFTC exclusive jurisdiction over them.

76.     At the press conference announcing the commencement of the Kalshi Action, the State Attorney General said that "Kalshi really is just a bookie with a fancy name, and a huge amount of venture capital behind them."  David Gutman, *Kalshi 'Prediction Market' Violates WA Antigambling Laws, AG Says*, Seattle Times (Mar. 27, 2026), https://www.seattletimes.com/seattle-news/politics/kalshi-prediction-market-violates-wa-antigambling-laws-ag-says.  The State Attorney General added that Kalshi "publicly pat[s] themselves on the back for being sneaky and getting around Washington's gambling laws," but "it's a lie and it's illegal."  *Id.*

77.     The State Attorney General's press release announcing the Kalshi Action further claimed that "Kalshi attempts to skirt state law by branding its betting platform as a 'prediction market,' but whatever Kalshi chooses to call it, Kalshi's operations clearly fall under the definition of illegal gambling in Washington."  Press Release, Wash. State Off. of the Att'y Gen., *Washington Sues Online Betting Platform Kalshi for Illegal Gambling* (Mar. 27, 2026), https://www.atg.wa.gov/news/news-releases/washington-sues-online-betting-platform-kalshiillegal-gambling.

78.     In the Kalshi Action, the State Attorney General moved for a preliminary injunction to enjoin Kalshi from offering its event contracts in the state.  On July 20, 2026, the court granted the State Attorney General's motion and the court intends to enter an order setting out the specific terms of the preliminary injunction by August 5, 2026.  Order, *State v. KalshiEx LLC*, No. 26-2-10264-3 (King Cnty. Super. Ct. July. 20, 2026).

79.     On July 21, 2026, the State Attorney General stated "[t]his victory is the first step toward holding Kalshi accountable for their brazen violations of Washington law."  Press Release, Wash. State Off. of the Att'y Gen., *Judge finds Kalshi's online gambling likely violates state law* (July 21, 2026) https://www.atg.wa.gov/news/news-releases/judge-finds-kalshi-s-

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 22
CASE NO. 2:26-CV-02579

online-gambling-likely-violates-state-law.  The State Attorney General further reiterated that "[t]he definition of gambling under Washington law is 'staking or risking something of value upon the outcome of a contest of chance or a future contingent event,' and Kalshi's activities fall squarely within that definition." *Id.*

80.     Washington has also jointly filed amicus briefs with other states in the Third, Fourth and Ninth Circuits taking the position that states have the authority to prohibit federally authorized event contracts as contrary to state gambling laws.  *See* Brief of Amici Curiae of Nevada, Ohio, 32 Other States, District of Columbia, and Northern Mariana Islands Supporting Appellants, ECF No. 29, *KalshiEx LLC v. Flaherty*, No. 25-1922 (3d Cir. Jun. 17, 2025); Brief of Amici Curiae of Nevada, Ohio, 36 Other States, and the District of Columbia Supporting Appellees, ECF No. 41-1, *KalshiEx LLC v. Martin*, No. 25-1892 (4th Cir. Dec. 22, 2025); Brief of Amici Curiae of New Jersey, Ohio, 37 Other States, and the District of Columbia Supporting Appellees, ECF No. 48.1, *KalshiEX LLC v. Assad*, et al., No. 25-7516 (9th Cir. Jan. 30, 2026); Brief of Amici Curiae of Ohio, New Jersey, 37 Other States, and the District of Columbia Supporting Appellees, ECF No. 76.1, *N. Am. Derivatives Exch., Inc. v. Nevada*, Nos. 25- 7187, 25-7516, 25-7831 (9th Cir. Mar. 10, 2026).

81.     Two of these amicus briefs were filed in this Circuit, including in a Ninth Circuit appeal in which OG is an opposing party.  *N. Am. Derivatives Exch., Inc. v. Nevada*, Nos. 25-7187, 25-7516, 25-7831 (9th Cir. Mar. 10, 2026).  Those amicus briefs assert that "federal law does not preempt States from regulating . . . events contracts," ECF No. 48.1, *KalshiEX LLC v. Assad*, et al., No. 25-7516 (9th Cir. Jan. 30, 2026), and that the CFTC's assertion of its own exclusive jurisdiction is wrong, *see* ECF No. 76.1, *N. Am. Derivatives Exch., Inc. v. Nevada*, Nos. 25- 7187, 25-7516, 25-7831 (9th Cir. Mar. 10, 2026).

82.     In light of the civil enforcement action commenced by the State Attorney General against Kalshi, Defendants' roles in enforcing Washington gaming laws, WSGC's formal guidance declaring prediction markets "unauthorized" in Washington, Washington's coordinated advocacy in support of state regulators in other cases, and Defendants' public

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 23
CASE NO. 2:26-CV-02579

BALLARD SPAHR LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WA 98101
206.223.7000  FAX: 206.223.7107

statements committing to continue enforcing state law against prediction markets, there is a concrete and imminent threat that Defendants will file an enforcement action against OG as they did against Kalshi. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'") (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).

**G.    Defendants' Enforcement Against OG Will Imminently and Irreparably Harm OG and Interfere with Its Ability to Conduct Federally Regulated Activities.**

83.    OG's rulebook sets forth over 50 different event contracts, all of which are subject to federal regulation pursuant to the process described above.

84.    OG permits event contracts to be purchased and sold by residents of Washington and other states and territories.

85.    As a result of Defendants' threatened conduct described above, there is an imminent likelihood that Defendants' forthcoming actions will violate the Supremacy Clause of the U.S. Constitution and subject OG and its customers to irreparable harm. Being subject to an unlawful state enforcement action would cause OG irreparable injury, both in economic terms and in terms of being restrained from lawful activity without any monetary recourse.

86.    Ceasing to permit Washington residents to purchase or sell event contracts on its DCM in order to avoid civil penalties or sanctions pursued by Defendants would deprive OG of the revenue that it would otherwise derive from trading of event contracts by Washington residents. These ongoing economic losses would be unrecoverable because sovereign immunity bars recovery for monetary damages. *See Alden v. Maine*, 527 U.S. 706, 712-13 (1999). Damages that are unrecoverable due to sovereign immunity constitute irreparable harm. *See Idaho v. Coeur d'Alene Tribe,* 794 F.3d 1039, 1046 (9th Cir. 2015); *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009) ("Because the economic injury doctrine rests only on ordinary equity principles precluding injunctive relief where a remedy at law is adequate, it does not apply where, as here, the [Plaintiff] can obtain no remedy in damages against the state because of the Eleventh Amendment."), *vacated on other grounds*, 565 U.S.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 24
CASE NO. 2:26-CV-02579

BALLARD SPAHR LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WA 98101
206.223.7000  FAX: 206.223.7107

606 (2012); *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660 (2025) (per curiam) (although "the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped'").

87.    If OG were to cease permitting Washington residents to purchase or sell event contracts on its DCM to avoid an enforcement action, it would also suffer competitive injury by losing the ability to compete as a market for event contracts against other federally registered DCMs operating in the state.

88.    OG could not avoid irreparable harm by seeking a license in Washington or by ceasing to offer event contracts trading in Washington.  Obtaining a gambling license in Washington may require significant hurdles that could require OG to evade its CFTC-mandated DCM obligations.  In addition, it would be entirely impracticable for OG to subject itself to the often conflicting regulations of each of the states in which it offers federally regulated event contracts for trading.  Accepting such jurisdiction would subject OG to the very patchwork of state regulation (including prohibitions, regulations, reporting obligations, registration costs, and other rules) that Congress expressly preempted under the CEA.  Different states have taken different approaches to regulation of online gambling.  Many states permit online gambling, subject to state-level regulation.  Others, such as Utah, prohibit it entirely.  It would be impossible for OG to both offer "impartial access" to its DCM as required by 17 C.F.R. § 38.151(b) and simultaneously comply with state gaming laws in 50 states.

89.    OG is also irreparably harmed by the penalties available to enforce Defendants' assertion of jurisdiction.  In the Kalshi Complaint, the State Attorney General alleges that a federally regulated market is liable for severe civil penalties, including $7,500 in civil penalties for each Consumer Protection Act violation and repayment to Washington traders of all revenue earned.  *See* Kalshi Complaint ¶¶ 5.2-6.13 (alleging that Kalshi's event contract activities violate RCW §§ 9.46.0241(3)–(4), 9.46.0253, 9.46.0269(d), 9.46.0368, 9.46.180, 9.46.215, 9.46.217, 9.46.220-.222, 9.46.228, 9.46.240, 19.86.010, 19.86.020); *see also* RCW § 19.86.140 ("Every person who violates RCW 19.86.020 shall forfeit and pay a civil penalty of not more

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 25
CASE NO. 2:26-CV-02579

than $7,500 for each violation."); *id*. § 4.24.070 ("All persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover . . . such money or things of value won, the amount of money or the value of the thing so lost.").

90.     The threat of enforcement alone presents OG with the *Hobson's* choice between subjecting itself to potential civil or criminal penalties brought by the State Attorney General, with all the expenditures and reputational damage that entails, or incurring the substantial monetary expenditures to ensure compliance with the authority the State Attorney General has asserted. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (finding injunctive relief available where imminent enforcement actions created such a *Hobson's* choice leaving party with no adequate remedy at law). This latter choice also violates the CFTC's Core Principles by disrupting contracts or geographically limiting who can enter contracts on OG's national exchange. *See supra* ¶¶ 38-40.

91.     This *Hobson's* choice is not hypothetical—the exact issue has reached a tipping point with the CFTC's Order directing Kalshi to "fulfill open trades in the ordinary course of business" despite a state court order to "force-liquidate the open positions" of Michigan residents. CFTC Order at 3, 9. The CFTC found that compliance with the state court order would cause price and market distortions in violation of CEA Core Principle 4, "which requires DCMs to prevent manipulation, price distortion, and disruption of the cash-settlement process." *Id*. at 8. Here, OG's compliance with Washington's gambling laws would cause OG to violate the CFTC's Core Principles and risk its certification as a DCM.

92.     If OG were to submit to the regulatory oversight of the WSGC to avoid an enforcement action, OG would be subjected to a regulatory regime inherently in conflict with CFTC regulations, including its Core Principles, and the very concept of a registered DCM.

93.     Inaction in the face of Defendants' likely assertion of authority to regulate DCMs would threaten the future of OG's business in Washington. An actual and substantial controversy exists between OG and Defendants as to their respective legal rights and duties. The imminent threat of an enforcement action against OG will result in irreparable injury to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 26
CASE NO. 2:26-CV-02579

BALLARD SPAHR LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WA 98101
206.223.7000  FAX: 206.223.7107

OG, including, but not limited to, criminal liability, civil liability, economic hardship, and impairment of existing contractual relationships.

94.    OG has no plain, speedy, or adequate remedy at law to address the wrongs described herein.   Moreover, because money damages are generally not available in suits against state government agencies, OG likely would be left without a remedy in the absence of prospective relief.

95.    OG therefore brings this action to seek declaratory and injunctive relief restraining Defendants from enforcing Washington law that interferes with the operation and function of OG's market described herein.

## COUNT I

### (EXPRESS PREEMPTION–AGAINST ALL DEFENDANTS)

96.    Plaintiff incorporates all prior paragraphs by reference.

97.    Under 28 U.S.C. § 2201(a), the Court may, "[i]n a case of actual controversy within its jurisdiction . . . declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

98.    An actual controversy exists between OG, on the one hand, and the Defendants, on the other, regarding whether Defendants have legal authority to regulate the trading of event contracts.

99.    Washington's Gambling Act, RCW § 9.46, Recovery of Money Lost at Gambling Act, RCW § 4.24.070, and Consumer Protection Act, RCW § 19.86, set out a state regulatory scheme for gambling in Washington.

100.    *First*, Washington's Gambling Act effectively banned all online gambling in Washington.  RCW § 9.46.240.  It defines "gambling" broadly to include "staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence, upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome."  RCW § 9.46.0237.

BALLARD SPAHR LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WA 98101
206.223.7000  FAX: 206.223.7107

101.    A "contest of chance" means "any contest, game, gaming scheme, or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein."  RCW § 9.46.0225.

102.    A "thing of value" means "any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise, directly or indirectly, contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge."  RCW § 9.46.0285.

103.    Washington's Gambling Act also makes "professional gambling" illegal.  RCW § 9.46.220-.222.   "Professional gambling" occurs when an entity "knowingly accepts or receives money or other property pursuant to an agreement or understanding with any other person whereby he or she participates or is to participate in the proceeds of gambling activity."  RCW § 9.46.0269.

104.    Washington considers "bookmaking"—accepting bets for a fee—to constitute illegal "professional gambling."  RCW § 9.46.0213; RCW § 9.46.0269(d); RCW § 9.46.220-222.

105.    Washington's Gambling Act also makes online sports wagers illegal in Washington unless "placed and accepted at a tribe's gaming facility [and] only while the customer placing the wager is physically present on the premises of a tribe's gaming facility."  RCW § 9.46.0368.

106.    Washington's Gambling Act also prohibits "gambling records" and unlicensed "gambling devices."  "Gambling records" include "any record, receipt, ticket, certificate, token, slip or notation given, made, used or intended to be used in connection with professional gambling."  RCW §§ 9.46.0253, 9.46.217.  "Gambling devices" include "any device . . . or installation designed primarily for use in connection with professional gambling" such as "electronic games of chance."  RCW § 9.46.0241.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 28
CASE NO. 2:26-CV-02579

107. *Second*, Washington's Recovery of Money Lost at Gambling Act provides that "[a]ll persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover from the dealer or player winning, or from the proprietor for whose benefit such game was played or dealt, or such money or things of value won, the amount of the money or the value of the thing so lost." RCW § 4.24.070.

108. *Third*, Washington's Consumer Protection Act prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW § 19.86.020.

109. By threatening to enforce the statutes at ¶¶ 99-108 or any other statutes, and any rules adopted thereunder, against a federally licensed DCM such as OG, Defendants are impermissibly intruding on the CFTC's exclusive jurisdiction to regulate derivatives transactions on federally designated contract markets.

110. For the reasons described above, without regard to whether Defendants have correctly interpreted Washington law, OG is authorized to list and offer event contracts to Washington residents (and residents of each of the other states and territories of the United States) pursuant to the CEA. Whether trading in particular event contracts is permitted is a question subject to the "exclusive jurisdiction" of the CFTC. 7 U.S.C. § 2(a)(1)(A).

111. To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder overlap with Washington law, Washington law is preempted pursuant to the Supremacy Clause, which provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

112. The Supremacy Clause mandates that federal law preempts state law in any field over which Congress has expressly reserved exclusive authority to the federal government.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 29
CASE NO. 2:26-CV-02579

BALLARD SPAHR LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WA 98101
206.223.7000  FAX: 206.223.7107

113.    The CEA's express preemption of state laws purporting to regulate trading on federally regulated derivatives markets or otherwise under the oversight of the CFTC could not be more clear.  Congress gave the CFTC "exclusive jurisdiction" to regulate derivatives trading on approved exchanges for on-exchange trading.  7 U.S.C. § 2(a)(1)(A).  Without a unified approach to derivatives regulation, Congress feared that fragmented and uncoordinated state regulation would lead to "total chaos."  Senate Hearings, 93rd Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).  Congress punctuated the importance of preemption of state law by ensuring federal law supersedes and preempts state gaming law as applied to financial instruments the CFTC exempted from the registered exchange requirement.  *See* 7 U.S.C. § 16(e)(2).  Having analyzed the text, purpose, and history of the CEA, courts nationwide have agreed that Congress intended to preempt state law in derivatives trading on CFTC-regulated exchanges.  *See, e.g.*, *KalshiEX, LLC v. Flaherty*, No. 25-1922, 2026 WL 924004, at *2-6 (3d Cir. Apr. 6, 2026); *KalshiEX, LLC v. Johnson*, No. CV-26-01715, 2026 WL 1223373, at *9 (D. Ariz. May 5, 2026); *KalshiEX LLC v. Orgel*, No. 3:26-CV-00034, 2026 WL 474869, at *9-10 (M.D. Tenn. Feb. 19, 2026); *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1055-57 (9th Cir. 2003); *Am. Agric. Movement*, 977 F.2d at 1156; *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979); *Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 205-07 (N.D. Ala. 1981); *Jones v. B. C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).

114.    Defendants may therefore not enforce Washington's gambling laws against OG because OG is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq.*

**COUNT II**

**(FIELD PREEMPTION–AGAINST ALL DEFENDANTS)**

115.    Plaintiff incorporates all prior paragraphs by reference.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 30
CASE NO. 2:26-CV-02579

BALLARD SPAHR LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WA 98101
206.223.7000  FAX: 206.223.7107

116. Under 28 U.S.C. § 2201(a), the Court may, "[i]n a case of actual controversy within its jurisdiction . . . declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

117. An actual controversy exists between OG, on the one hand, and the Defendants, on the other, regarding whether Defendants have legal authority to regulate the trading of event contracts.

118. By threatening to enforce the statutes at ¶¶ 99-108 or any other statutes, and any rules adopted thereunder, against OG, Defendants are impermissibly intruding on the CFTC's exclusive jurisdiction to regulate derivatives transactions on federally designated contract markets.

119. For the reasons described above, without regard to whether Defendants have correctly interpreted Washington law, OG is authorized to list and offer event contracts to Washington residents (and residents of each of the other states and territories of the United States) pursuant to the CEA. Whether trading in particular event contracts is permitted is a question subject to the "exclusive jurisdiction" of the CFTC.

120. To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder overlap with Washington law, Washington law is preempted pursuant to the Supremacy Clause.

121. The Supremacy Clause mandates that federal law preempts state law in any field over which Congress has adopted a comprehensive regulatory scheme, thus occupying the field for regulation.

122. Through the CEA and its amendments, Congress has adopted a comprehensive regulatory scheme regulating derivatives trading on regulated markets, including the trading of event contracts. *See* 7 U.S.C. §§ 1 *et seq.* That scheme includes creating the CFTC and vesting it with exclusive authority to regulate derivatives trading.

123. Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 31
CASE NO. 2:26-CV-02579

2(c)(5)(C)(i)—authority that is completely incompatible with parallel state regulation of the same subject matter. Because federal law occupies the entire field of regulating derivatives trading on regulated markets, the threatened actions are field-preempted under the Supremacy Clause. *See Flaherty*, 2026 WL 924004, at *4.

124. Defendants therefore may not enforce Washington's gaming laws against OG because OG is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

## COUNT III

## (CONFLICT PREEMPTION–AGAINST ALL DEFENDANTS)

125. Plaintiff incorporates all prior paragraphs by reference.

126. Under 28 U.S.C. § 2201(a), the Court may, "[i]n a case of actual controversy within its jurisdiction . . . declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

127. An actual controversy exists between OG, on the one hand, and the Defendants, on the other, regarding whether Defendants have legal authority to regulate the trading of event contracts.

128. By threatening to enforce the statutes at ¶¶ 99-108 or any other statutes, and any rules adopted thereunder, against OG, Defendants are impermissibly intruding on the CFTC's exclusive jurisdiction to regulate derivatives transactions on federally designated contract markets.

129. For the reasons described above, without regard to whether Defendants have correctly interpreted Washington law, OG is authorized to list and offer event contracts to Washington residents (and residents of each of the other states and territories of the United States) pursuant to the CEA. Whether trading in particular event contracts is permitted is a question subject to the "exclusive jurisdiction" of the CFTC.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 32
CASE NO. 2:26-CV-02579

BALLARD SPAHR LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WA 98101
206.223.7000  FAX: 206.223.7107

130.    To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder conflict with Washington law, Washington law is preempted pursuant to the Supremacy Clause.

131.    The Supremacy Clause mandates that federal law preempts state law where compliance with the state law would conflict with federal law.

132.    Defendants likewise threatened to deploy Washington law against OG in a manner that conflicts with federal law and policy.  Defendants seek to ban event contracts that federal law and the CFTC have authorized or subject them to state regulatory requirements that conflict with federal law, which would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges.  For that reason among others, the threatened actions are conflict-preempted under the Supremacy Clause.  *See Flaherty*, 2026 WL 924004, at \*4.

133.    Defendants therefore may not enforce Washington's gaming laws against OG because OG is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff OG requests that judgment be entered in its favor and against Defendants as follows:

1.    That this Court enter a judgment declaring that the challenged provisions, or any other state laws pertaining to gambling or wagering, as applied to OG, violate the Supremacy Clause and are therefore preempted, unconstitutional and invalid;

2.    That this Court issue a permanent injunction that prohibits Defendants as well as their successors, agents, and employees, from enforcing the challenged provisions or any other state laws pertaining to gambling or wagering, as applied to OG;

3.    Award such other relief within this Court's discretion that it deems just and proper.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 33
CASE NO. 2:26-CV-02579

DATED:  July 22, 2026

BALLARD SPAHR LLP

By *s/ John S. Devlin*
  John S. Devlin, III, WSBA No. 23988
  devlinj@ballardspahr.com
  1301 Second Avenue, Suite 2800
  Seattle, WA 98101
  Tel: 206-223-7000

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP

  Robert A. Fumerton
  (*pro hac vice* forthcoming)
  David Meister
  (*pro hac vice* forthcoming)
  Judith A. Flumenbaum
  (*pro hac vice* forthcoming)
  One Manhattan West
  New York, NY 10001
  Telephone: (212) 735-3000
  david.meister@skadden.com
  robert.fumerton@skadden.com
  judy.flumenbaum@skadden.com

  Shay Dvoretzky
  (*pro hac vice* forthcoming)
  Parker Rider-Longmaid
  (*pro hac vice* forthcoming)
  Sylvia O. Tsakos
  (*pro hac vice* forthcoming)
  1440 New York Avenue NW
  Washington, DC 20005
  Telephone: (202) 371-7000
  shay.dvoretzky@skadden.com
  parker.rider-longmaid@skadden.com
  sylvia.tsakos@skadden.com

  *Attorneys for Plaintiff North American
  Derivatives Exchange, Inc., d/b/a OG*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 34
CASE NO. 2:26-CV-02579